

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-10-1996

# Georgine v. Amchem Prod Inc

Precedential or Non-Precedential:

Docket 94-1925,94-1927,94-1928,94-1929

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

## Recommended Citation

"Georgine v. Amchem Prod Inc" (1996). *1996 Decisions.* Paper 175.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/175

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————————————————————

NOS. 94-1925, 94-1927, 94-1928, 94-1929, 94-1930, 94-1931,
94-1932, 94-1960, 94-1968, 94-2009, 94-2010, 94-2011,
94-2012, 94-2013, 94-2066, 94-2067, 94-2068, 94-2085, 95-1705

———————————————————————————

ROBERT A. GEORGINE; LAVERNE WINBUN, EXECUTRIX OF THE ESTATE
OF JOSEPH E. WINBUN, DECEASED, AND IN HER OWN RIGHT; AMBROSE
VOGT, JR.; JOANNE VOGT, HIS WIFE; CARLOS RAVER; DOROTHY M.
RAVER, HIS WIFE; TIMOTHY MURPHY; GAY MURPHY, HIS WIFE; TY T.
ANNAS; ANNA MARIE BAUMGARTNER, EXECUTRIX OF THE ESTATE OF
JOHN A. BAUMGARTNER, DECEASED; NAFSSICA KEKRIDES,
INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF PAVLOS
KEKRIDES, DECEASED; WILLIAM H. SYLVESTER, EXECUTOR AND
PERSONAL REPRESENTATIVE OF THE ESTATE OF
FRED A. SYLVESTER, DECEASED

v.

AMCHEM PRODUCTS, INC.; A.P. GREEN INDUSTRIES, INC.;
ARMSTRONG WORLD INDUSTRIES, INC.; CERTAINTEED CORPORATION;
C.E. THURSTON & SONS, INC.; DANA CORPORATION; FERODO
AMERICA, INC.; FLEXITALLIC, INC.; GAF BUILDING MATERIALS,
INC.; I.U. NORTH AMERICA, INC.; MAREMONT CORPORATION;
**ASBESTOS CLAIMS MANAGEMENT CORP; NATIONAL SERVICES INDUSTRIES,
INC.; NOSROC CORPORATION; PFIZER, INC.; QUIGLEY COMPANY, INC.;
SHOOK & FLETCHER INSULATION COMPANY; T&N, PLC;
**UNION CARBIDE CORPORATION; UNITED STATES GYPSUM COMPANY

v.

ADMIRAL INSURANCE COMPANY; AFFILIATED FM INSURANCE COMPANY;
AIU INSURANCE COMPANY; ALLIANZ INSURANCE COMPANY; ALLIANZ
UNDERWRITERS INSURANCE COMPANY, INDIVIDUALLY AND AS
SUCCESSOR TO ALLIANZ UNDERWRITERS, INC.; ALLSTATE INSURANCE
COMPANY, AS SUCCESSOR TO NORTHBROOK EXCESS AND SURPLUS
INSURANCE COMPANY; AMERICAN BANKERS INSURANCE COMPANY OF FLORIDA;
AMERICAN CENTENNIAL INSURANCE COMPANY; AMERICAN HOME
ASSURANCE COMPANY; AMERICAN MOTORISTS INSURANCE COMPANY;
AMERICAN RE-INSURANCE COMPANY; APPALACHIAN INSURANCE COMPANY
OF PROVIDENCE; ARGONAUT INSURANCE COMPANY; ATLANTA INTERNATIONAL
INSURANCE COMPANY; CAISSE INDUSTRIELLE D'ASSURANCE MUTUELLE;
C.E. HEATH COMPENSATION AND LIABILITY INSURANCE COMPANY AS
SUCCESSOR TO EMPLOYERS' SURPLUS LINE INSURANCE COMPANY;
CENTENNIAL INSURANCE COMPANY; CENTRAL NATIONAL INSURANCE
COMPANY OF OMAHA; CHICAGO INSURANCE COMPANY; CITY INSURANCE
COMPANY; COLONIA VERSICHERUNG AKTIENGESELLSCHAFT; COLUMBIA
CASUALTY COMPANY; COMMERCIAL UNION INSURANCE COMPANY,

AS SUCCESSOR TO COLUMBIA CASUALTY COMPANY, EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY, EMPLOYERS COMMERCIAL UNION INSURANCE COMPANY OF AMERICA, AND EMPLOYERS' LIABILITY ASSURANCE CORPORATION LIMITED; COMPAGNIE EUROPEENNE DE REASSURANCES; THE CONSTITUTION STATE INSURANCE COMPANY; CONTINENTAL CASUALTY COMPANY; EMPLOYERS MUTUAL CASUALTY COMPANY; EVANSTON INSURANCE COMPANY; EXECUTIVE RE INDEMNITY INC., AS SUCCESSOR TO AMERICAN EXCESS INSURANCE COMPANY; FEDERAL INSURANCE COMPANY; GENERAL REINSURANCE CORPORATION; GIBRALTAR CASUALTY COMPANY; GOVERNMENT EMPLOYEES INSURANCE COMPANY; GRANITE STATE INSURANCE COMPANY; HIGHLANDS INSURANCE COMPANY; THE HOME INDEMNITY COMPANY; THE HOME INSURANCE COMPANY; HOUSTON GENERAL INSURANCE COMPANY; HUDSON INSURANCE COMPANY; INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA; INTERSTATE FIRE & CASUALTY COMPANY; JEFFERSON INSURANCE COMPANY OF NEW YORK; LANDMARK INSURANCE COMPANY; LA PRESERVATRICE FONCIERE TIARD, INDIVIDUALLY AND AS SUCCESSOR TO LA FONCIERE ASSURANCES TRANSPORTS ACCIDENTS AND LA PRESERVATRICE; LE SECOURS; LEXINGTON INSURANCE COMPANY; LILLOISE D'ASSURANCES, AS SUCESSOR TO LILLOISE D'ASSURANCES ET DE REASSURANCES; LUMBERMENS MUTUAL CASUALTY COMPANY; MARYLAND CASUALTY COMPANY; MICHIGAN MUTUAL INSURANCE COMPANY; MUTUELLE GENERALE FRANCAISE; NATIONAL AMERICAN INSURANCE COMPANY OF CALIFORNIA, AS SUCCESSOR TO THE STUYVESANT INSURANCE COMPANY; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; NORTHBROOK INDEMNITY COMPANY; NORTH STAR REINSURANCE CORPORATION; OLD REPUBLIC INSURANCE COMPANY; PENNSYLVANIA MANUFACTURERS' ASSOCIATION INSURANCE COMPANY; THE PROTECTIVE NATIONAL INSURANCE COMPANY OF OMAHA; PRUDENTIAL REINSURANCE COMPANY; PURITAN INSURANCE COMPANY, INDIVIDUALLY AND AS SUCCESSOR TO THE MANHATTAN FIRE AND MARINE INSURANCE COMPANY; RANGER INSURANCE COMPANY; REPUBLIC INSURANCE COMPANY; SAFECO INSURANCE COMPANY OF AMERICA; SAFETY NATIONAL CASUALTY CORPORATION, AS SUCCESSOR TO SAFETY MUTUAL CASUALTY CORPORATION; ST. PAUL FIRE AND MARINE INSURANCE COMPANY, INDIVIDUALLY AND AS SUCCESSOR TO BIRMINGHAM FIRE INSURANCE COMPANY; ST. PAUL GUARDIAN INSURANCE COMPANY; STONEWALL INSURANCE COMPANY; STEONEWALL SURPLUS LINES INSURANCE COMPANY; SUN ALLIANCE AND LONDON INSURANCE PLC; TOKIO MARINE & FIRE INSURANCE COMPANY, LIMITED; THE TRAVELERS INDEMNITY COMPANY; THE TRAVELERS INSURANCE COMPANY; UNIGARD SECURITY INSURANCE COMPANY, AS SUCCESSOR TO UNIGARD MUTUAL INSURANCE COMPANY; UNION DES ASSURANCES DE PARIS; YOSEMITE INSURANCE COMPANY; EURINCO ALLEGEMEINE VERSICHERUNGS, A.G.; F&M INSURANCE COMPANY, LTD.; LA CONCORDE; LEXINGTON INSURANCE COMPANY, LTD.; L'UNION ATLANTIQUE S.A. D'ASSURANCES; N.V. ROTTERDAMSE ASSURANTIEKAS PER MEES & ZOONEN; NATIONAL CONTINENTAL INSURANCE COMPANY AS SUCCESSOR TO AMERICAN STAR INSURANCE COMPANY; NEWFOUNDLAND AMERICAN INSURANCE CO., LTD.; NEW HAMPSHIRE INSURANCE COMPANY, LTD.; PHOENIX ASSURANCE; RELIANCE INSURANCE COMPANY; SIRIUS (UK)

INSURANCE COMPANY, PLC; TRIDENT GENERAL INSURANCE COMPANY; GREAT AMERICAN INSURANCE COMPANY; AMERICAN EMPIRE SURPLUS LINES INSURANCE COMPANY, AS AUTHORIZED AGENT ON BEHALF OF TRANSPORT INDEMNITY COMPANY

*George Windsor; Constance Windsor, Michael Windsor and Karen Windsor,
           Appellants in Nos. 94-1925/2009

*White Lung Association of New Jersey, National Asbestos Victims Legal Action Organizing Committee, the Oil, Chemical, and Atomic Workers International Union, The Skilled Trades Association, Myles O'Malley, Marta Figueroa, Robert Fiore, Roh Maher, and Lynn Maher, (in her own behalf and as next friend for her minor children, Jessica Marie Maher, Jamie Marion Maher, and Jennifer Megan Maher),
           Appellants in Nos. 94-1927/1968

*Richard R. Preston, Sr. and Louis C. Anderson,
           Appellants in Nos. 94-1928/2013

*Albert and Margaret Hertler,
           Appellants in No. 94-1929

*Richard E. Blanchard, D.D.S., Jack S. Boston, James L. Anderson, Personal Representative of Robert L. Anderson and Harrison O. McLeod,
           Appellants in Nos. 94-1930/2066

*Iona Cunningham, as representative of the estate of Charles Cunningham, and Twila Sneed,
           Appellants in Nos. 94-1931/2010

*Aileen Cargile, Betty Francom, John Wong, John Soteriou, Harold Hans Emmerich and Thomas Corey,
           Appellants in Nos. 94-1932/2012

*William J. Golt, Sr. and Phyllis Golt,
           Appellants in Nos. 94-1960/2011

*Joe and Lynne Dominguez,
           Appellants in No. 94-2067

*Kathryn Toy, individually, and as representative of the estate of Edward Toy,
           Appellants in Nos. 94-2068

*John Paul Smith,
           Appellant in No. 94-2085

*Casimir Balonis, Margaret Balonis and Shepard A. Hoffman,
       Appellants in No. 95-1705

          *(Pursuant to F.R.A.P. Rule 12(a))

       **(Pursuant to Clerk's Order dated 11/9/94)
       _____

On Appeal From the United States District Court
     For the Eastern District of Pennsylvania

           D.C. Civ. No. 93-cv-00215
      _____

            Argued: November 21, 1995

       Before: BECKER, GREENBERG, and WELLFORD,
                 Circuit Judges.[0]

             (Filed  May 10, 1996)

STEVEN J. COOPERSTEIN, ESQUIRE
Brookman, Rosenberg, Brown & Sandler
30 South 15th Street, 17th Floor
Philadelphia, PA  19102

Counsel for George Windsor, Constance Windsor,
Michael Windsor and Karen Windsor,
Appellants in Nos. 94-1925/2009

BRIAN L. WOLFMAN, ESQUIRE (ARGUED)
ALAN B. MORRISON, ESQUIRE
ALAN T.L. SUN, ESQUIRE
Public Citizen Litigation Group
Suite 700, 2000 P Street, NW
Washington, DC  20036

Counsel for White Lung Association of New Jersey, National
Asbestos Victims Legal Action Organizing Committee,
The Oil, Chemical, and Atomic Workers International
Union, The Skilled Trades Association, Myles O'Malley,
Marta Figueroa, Robert Fiore, Roh Maher, and Lynn Maher,
(on her own behalf and as next friend for her minor
children, Jessica Marie Maher, Jamie Marion Maher, and
Jennifer Megan Maher), Appellants in Nos. 94-1927/1968

LAURENCE H. TRIBE, ESQUIRE (ARGUED)
BRIAN S. KOUKOUTCHOS, ESQUIRE

_____

[0]Honorable Harry W. Wellford, United States Circuit Judge for the
            Sixth Circuit, sitting by designation.

JONATHAN S. MASSEY, ESQUIRE
1575 Massachusetts Avenue
Cambridge, MA  02138-3800

BRENT M. ROSENTHALL, ESQUIRE
Counsel of Record
FREDERICK M. BARON
STEVE BAUGHMAN
BARON & BUDD, P.C.
3102 Oak Lawn Avenue Suite 1100
Dallas, TX  75219-4281

Counsel for Richard R. Preston, Sr. and Louis C. Anderson, Appellants in Nos. 94-1928/2013

JOSEPH D. SHEIN, ESQUIRE
Shein, Johnson & Berezofsky
235 South 17th Street
Philadelphia, PA  19103

Counsel for Albert and Margaret Hertler, Appellants in No. 94-1929

MARLA A. MACEY, ESQUIRE
TIMOTHY J. HOGAN, ESQUIRE
Law Office of Peter G. Angelos
John Wanamaker Building
100 Penn Square East
Suite 1000, 10th Floor
Philadelphia, PA  19107

Counsel for Richard E. Blanchard, D.D.S., Jack S. Boston, James L. Anderson, Personal Representative of Robert L. Anderson and Harrison O. McLeod, Appellants in Nos. 94-1930/2066

STEVEN KAZAN, ESQUIRE
AARON SIMON, ESQUIRE
Kazan, McClain, Edises, Simon & Abrams
171 Twelfth Street, Suite 300
Oakland, CA  94607

BRAD SELIGMAN, ESQUIRE (ARGUED)
JOCELYN LARKIN, ESQUIRE
DONNA RYU, ESQUIRE
1049 Key Route Boulevard
Albany, CA  94706

DAVID RUDOVSKY, ESQUIRE
Kairys, Rudovsky, Kalman & Epstein
924 Cherry Street, 5th Floor
Philadelphia, PA  19107

Counsel for
Iona Cunningham, as representative
of the estate of Charles Cunningham, and Twila Sneed,
Appellants in Nos. 94-1931/2010 and

Aileen Cargile, Betty Francom, John Wong, John Soteriou,
Harold Hans Emmerich and Thomas Corey,
Appellants in Nos. 94-1932/2012

JOSHUA M. SPIELBERG, ESQUIRE
Tomar, Simonoff, Adourian & O'Brien
41 South Haddon Avenue
Haddonfield, NJ   08033

Counsel for William J. Golt, Sr. and Phyllis Golt,
Appellants in Nos. 94-1960/2011

DAVID R. DONADIO, ESQUIRE
Brayton, Gisvold & Harley
999 Grant Avenue
P.O. Box 2109
Novato, CA   94948

Counsel for Joe and Lynne Dominguez,
Appellants in No. 94-2067

DOUGLAS B. CANFIELD, ESQUIRE
Jacobs & Crumplar
2 East 7th Street
P.O. Box 1271
Wilmington, DE   19899

Counsel for Kathryn Toy, individually, and as
representative of the estate of Edward Toy,
Appellants in Nos. 94-2068

JAMES L. FERRARO, ESQUIRE
Ferraro & Associates
200 South Biscayne Boulevard
3800 First Union Financial Center
Miami, FL   33131-2310

Counsel for John Paul Smith,
Appellant in No. 94-2085

SHEPARD A. HOFFMAN, ESQUIRE
Suite 901
301 North Charles Street
Baltimore, MD   21201

Counsel for Casimir Balonis, Margaret Balonis,
and Shepard H. Hoffman, Appellants in No. 95-1705

GENE LOCKS, ESQUIRE (ARGUED)
JONATHAN MILLER, ESQUIRE
Greitzer & Locks
1500 Walnut Street, 20th Floor
Philadelphia, PA  19102

RONALD L. MOTLEY, ESQUIRE
JOSEPH F. RICE, ESQUIRE
Ness, Motley, Loadholt, Richardson & Poole
151 Meeting Street, Suite 600
Charleston, SC  29402


L. JOEL CHASTAIN, ESQUIRE
DESA A. BALLARD, ESQUIRE
Ness, Motley, Loadholt, Richardson & Poole
P.O. Box 365
Barnwell, SC  29812

Counsel for Appellees, Robert A. Georgine; Laverne Winbun,
Executrix of the estate of Joseph E. Winbun, deceased, and in her
own right; Ambrose Vogt, Jr.; Joanne Vogt, his wife; Carlos
Raver; Dorothy M. Raver, his wife; Timothy Murphy; Gay Murphy,
his wife; Ty T. Annas; Anna Marie Baumbartner, Executrix of the
Estate of John A. Baumgartner, deceased; Nafssica Kekrides,
individually and as administratrix of the estate of Pavlos
Kekrides, deceased; William H. Sylvester, Executor and Personal
Representative of the estate of Fred A. Sylvester, deceased

JOHN D. ALDOCK, ESQUIRE (ARGUED)
WENDY S. WHITE, ESQUIRE
ELIZABETH RUNYAN GEISE, ESQUIRE
RICHARD M. WYNER, ESQUIRE
HEATHER H. ANDERSON, ESQUIRE
Shea & Gardner
1800 Massachusetts Avenue, NW
Washington, DC  20036

JOHN G. GAUL, ESQUIRE
LAWRENCE FITZPATRICK, ESQUIRE
Center for Claims Resolution
504 Carnegie Center - 2nd Floor
Princeton, NJ  08540

Counsel for Appellees, Amchem Products, Inc.; A.P. Green
Industries, Inc.; Armstrong World Industries, Inc.;
Certainteed Corporation; C.E. Thurston & Sons, Inc.; Dana
Corporation; Ferodo America, Inc.; Flexitallic, Inc.; GAF

Building Materials, Inc.; I.U. North America, Inc.; Maremont Corporation; **Asbestos Claims Management Corp; National Services Industries, Inc.; Nosroc Corporation; Pfozer, Inc.; Quigley Company, Inc.; Shook & Fletcher Insulation Company; T&N, PLC; **Union Carbide Corporation; United States Gypsum Company

STEPHEN F. BROCK, ESQUIRE
Manta & Welge
2005 Market Street
One Commerce Square, 37th Floor
Philadelphia, PA  19103

JOSEPH T. MALLON, ESQUIRE
Dunn, Haase, Sullivan, Mallon, Cherner & Broadt
216 South Orange Street
Media, PA  19063

R. JEFF CARLISLE, ESQUIRE
AARON L. BOWERS, ESQUIRE
Lynberg & Watkins
888 South Figueroa Street
International Tower Plaza, 16th Floor
Los Angeles, CA  90017-2516

ELIT R. FELIX, II, ESQUIRE
Margolis, Edelstein & Scherlis
Sixth & Walnut Streets
The Curtis Center, 4th Floor
Philadelphia, PA  19106

JAMES J. RODGERS, ESQUIRE
Dilworth, Paxson, Kalish & Kauffman
1735 Market Street
3200 The Mellon Bank Center
Philadelphia, PA  19103

WILSON M. BROWN, III
Drinker, Biddle & Reath
1345 Chestnut Street
Philadelphia National Bank Building
Philadelphia, PA  19107-3496

THOMAS C. DeLORENZO, ESQUIRE
Marshall, Dennehey, Warner, Coleman & Goggin
1845 Walnut Street
Philadelphia, PA  19103

ROBERT R. REEDER, ESQUIRE
WILLIAM P. SHELLEY, ESQUIRE
Cozen & O'Connor
The Atrium

1900 Market Street
Philadelphia, PA  19103

LAWRENCE M. SILVERMAN, ESQUIRE
Silverman, Coopersmith, Hillman & Frimmer
Two Penn Center Plaza, Suite 910
Philadelphia, PA  19102

JOHN P. O'DEA, ESQUIRE
Stradley, Ronon, Stevens & Young
2600 One Commerce Square
Philadelphia, PA  19103

DANIEL P. LYNCH, ESQUIRE
Timby, Brown & Timby
1818 Market Street, Suite 3100
Philadelphia, PA  19103

MARC I. BRESSMAN, ESQUIRE
Budd, Larner, Gross, Rosenbaum,
   Greenberg & Sade
200 Lake Drive East
Woodland Falls Corporate Park
Suite 100
Cherry Hill, NJ  08002

DAVID J. D'ALOIA, ESQUIRE
Saiber, Schlesinger, Satz & Goldstein
One Gateway Center, Suite 1300
Newark, NJ  07102-5311
ALLAN C. MOLOTSKY, ESQUIRE
Post & Schell
1800 JFK Boulevard, 19th Floor
Philadelphia, PA  19103

THERESA W. HAJOST, ESQUIRE
Chadbourne & Parke
1101 Vermont Avenue, NW, Suite 900
Washington, DC  20005

LISA B. ZUCKER, ESQUIRE
German, Gallagher & Murtagh
200 So. Broad Street, 5th Floor
Philadelphia, PA  19102

RUDOLPH GARCIA, ESQUIRE
Saul, Ewing, Remick & Saul
3800 Centre Square West
Philadelphia, PA  19102

JOSEPH L. RUBY, ESQUIRE

Wiley, Rein & Fielding
1776 K Street, NW
Washington, DC  20006

Counsel for Remaining Appellees

DAN MORALES, ESQUIRE
Attorney General
JORGE VEGA, ESQUIRE
First Assistant Attorney General
LAQUITA A. HAMILTON, ESQUIRE
Deputy Attorney General for Litigation
PAUL ELLIOTT, ESQUIRE
Assistant Attorney General
Chief, Natural Resources Division
BRIAN E. BERWICK, ESQUIRE
Assistant Attorney General

Office of Attorney General of Texas
Environmental Protection Division
Natural Resources Division
P.O. Box 12548
Austin, Texas  78711-2548

Counsel for State of Texas-Amicus Curiae

ARTHUR H. BRYANT, ESQUIRE
LESLIE A. BRUECKNER, ESQUIRE
Trial Lawyers for Public Justice
Suite 800
1717 Massachusetts Avenue, NW
Washington, DC  20036


ROBERTA B. WALBURN, ESQUIRE
Robins, Kaplan, Miller, & Ciresi
2800 LaSalle Plaza
800 La Salle Avenue
Minneapolis, MN  55402

Counsel for Asbestos Victims of America and
Trial Lawyers for Public Justice-Amicus Curiae

W. DONALD McSWEENY, ESQUIRE
ROBERT H. RILEY, ESQUIRE
CATHERINE MASTERS EPSTEIN, ESQUIRE
Schiff, Hardin & Waite
7200 Sears Tower
Chicago, IL  60606

JAMES D. MILLER, ESQUIRE

King & Spalding
1730 Pennsylvania Avenue, NW
Washington, DC  20006

PHILIP McWEENY, ESQUIRE
DAVID L. GRAY, ESQUIRE
Owens-Illinois, Inc.
One SeaGate
Toledo, Ohio  43666

<u>Counsel for Owens-Illinois, Inc.-Amicus Curiae</u>

ROBERT G. VIAL, ESQUIRE
1717 Main Street, Suite 4400
Dallas, Texas  75201

GORDON S. RATHER, JR., ESQUIRE
200 W. Capitol Avenue, Suite 2200
Little Rock, Arkansas  72201

<u>Counsel for American Board of Trial Advocates-Amicus Curiae</u>

-------------------------

OPINION OF THE COURT
-------------------------

BECKER, <u>Circuit Judge</u>.

Every decade presents a few great cases that force the judicial system to choose between forging a solution to a major social problem on the one hand, and preserving its institutional values on the other.  This is such a case.  It is a class action that seeks to settle the claims of between 250,000 and 2,000,000 individuals who have been exposed to asbestos products against the twenty companies known as the Center for Claims Resolution (CCR).[0]  Most notably, the settlement would extinguish asbestos-related causes of action of exposed individuals who currently suffer no physical ailments, but who may, in the future, develop possibly fatal asbestos-related disease.  These "futures claims" of "exposure-only" plaintiffs would be extinguished even though they have not yet accrued.

---

[0]The CCR Companies are Amchem Products, Inc.; A.P. Green Industries, Inc.; Armstrong World Industries, Inc.; Asbestos Claims Management Corp. (formerly known as National Gypsum Co.); CertainTeed Corp.; C.E. Thurston and Sons, Inc.; Dana Corp.; Ferodo America, Inc.; Flexitallic Inc.; GAF Building Materials Corp.; I.U. North America, Inc.; Maremont Corp.; National Services Industries, Inc.; Nosroc Corp.; Pfizer Inc.; Quigley Co., Inc.; Shook & Fletcher Insulation Co.; T&N, plc; Union Carbide Corp.; and United States Gypsum Co.

All of the CCR defendants stopped manufacturing asbestos products circa 1975.  The assets of the CCR companies, together with their insurance coverage, represent a significant portion of the funds that will ever be available to pay asbestos-related claims.

The settlement, memorialized in a 106 page document, was not crafted overnight. Indeed, more than a case, this is a saga, reflecting the efforts of creative lawyers and an extremely able district judge to deal with the asbestos litigation explosion. Asbestos litigation has burdened the dockets of many state and federal courts, and has particularly challenged the capacity of the federal judicial system. The resolution posed in this settlement is arguably a brilliant partial solution to the scourge of asbestos that has heretofore defied global management in any venue.

However, against the need for effective resolution of the asbestos crisis, we must balance the integrity of the judicial system. Scholars have complained that the use of class actions to resolve mass toxic torts, particularly those involving futures claims, improperly involves the judiciary in the crafting of legislative solutions to vexing social problems. These criticisms are not merely abstract; they are levied in terms of the fundaments of the federal judicial polity: jurisdiction, justiciability, notice, and the requirements of Federal Rule of Civil Procedure 23.

This opinion addresses appeals of the district court's September 22, 1994, preliminary injunction, which prohibits members of the so-called Georgine class from pursuing asbestos-related personal injury claims in any other court pending the issuance of a final order in this case. The appellants ("objectors") are three groups of individuals with aligned interests who challenge the district court's injunction: the

"Windsor Group"; the New Jersey "White Lung Group"; and the "Cargile Group" (mesothelioma victims from California). The objectors challenge the district court's jurisdiction (both personal and subject matter) over the underlying class action, the justiciability of the case, the adequacy of class notice, and the propriety of class certification under Federal Rule of Civil Procedure 23.

Although we have serious doubts as to the existence of the requisite jurisdictional amount, justiciability, adequacy of notice, and personal jurisdiction over absent class members, we will, for reasons explained below, pass over these difficult issues and limit our discussion to the class certification issues. We conclude that this class meets neither the 23(a) requirements of typicality and adequacy of representation, nor the 23(b)(3) requirements of predominance and superiority. In In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768 (3d Cir.) [Hereinafter GM Trucks], cert. denied sub nom. General Motors Corp. v. French, 116 S. Ct. 88 (1995), we held that, for settlement classes, the 23(a) requirements must be applied as if the case were going to be litigated. We now hold that, because the 23(b)(3) requirements protect the same interests in fairness and efficiency as the 23(a) requirements, and because "[t]here is no language in [Rule 23] that can be read to authorize separate, liberalized criteria for settlement classes," id. at 799, the 23(b)(3) criteria must also be applied as if the case were to be litigated. While the better policy may be to alter the class certification inquiry to take settlement

into account, the current Rule 23 does not permit such an exception.

Examined as a litigation class, this case is so much larger and more complex than all other class actions on record that it cannot conceivably satisfy Rule 23. Initially, each individual plaintiff's claim raises radically different factual and legal issues from those of other plaintiffs. These differences, when exponentially magnified by choice of law considerations, eclipse any common issues in this case. In such circumstances, the predominance requirement of Rule 23(b) cannot be met. Furthermore, this amalgamation of factually and legally different plaintiffs creates problematic conflicts of interest, which thwart fulfillment of the typicality and adequacy of representation requirements of Rule 23(a). Primarily, the interests of the exposure only plaintiffs are at odds with those of the presently injured: the former have an interest in preserving as large a fund as possible while the latter seek to maximize front-end benefits.

This class also fails Rule 23(b)'s superiority prong. Even utilizing the management techniques pioneered by the Federal Judicial Center, we do not see how an action of this magnitude and complexity could practically be tried as a litigation class. This problem, when combined with the serious fairness concerns caused by the inclusion of futures claims, make it impossible to conclude that this class action is superior to alternative means of adjudication.

For the reasons we have preliminarily outlined, and which we will now explain in depth, we will vacate the district court's order certifying the plaintiff class and remand with directions to decertify the class and vacate the injunction. We recognize that our decision undermines the partial solution to the asbestos litigation crisis. However, in doing so, we avoid a serious rend in the garment of the federal judiciary that would result from the Court, even with the noblest motives, exercising power that it lacks. We thus leave legislative solutions to legislative channels.

I.    BACKGROUND FACTS AND PROCEDURAL HISTORY

Reciting the background facts and procedural history of this case could consume pages by the dozen. This history is, however, already well known. It has been chronicled in the opinion of the district court, see Georgine v. Amchem Prods., Inc., 157 F.R.D. 246, 254-67 (E.D. Pa. 1994); in the Cornell Law Review, see Symposium, Mass Tortes:  Serving Up Just Desserts, 80 Cornell L. Rev. 811 (1995); and has even surfaced on the Continuing Legal Education (CLE) circuit, see Legal Intelligencer (Philadelphia), Jan 31, 1996, at 34 (announcing a CLE Course on the "Lessons of Georgine").[0]  In short, the asbestos law world

---

[0] In addition to the Cornell Law Review Symposium, numerous articles have addressed the issues raised in this case. See, e.g., John C. Coffee, Jr., Class Wars:  The Dilemma of the Mass Tort Class Action, 95 Colum. L. Rev. 1343 (1995) (arguing for prudential limits on mass tort class actions and using this class action as a case study); Richard A. Nagareda, Turning From Tort to Administration, 94 Mich. L. Rev. 899 (1996) (discussing judicial review of mass tort settlements and focusing in part on

knows this case backwards and forwards.  We shall, therefore, set

forth only the essentials.


A.  The Genesis of the Case

        This case arises against the background of an asbestos

litigation crisis:

> [This] is a tale of danger known in the
> 1930s, exposure inflicted upon millions of
> Americans in the 1940s and 1950s, injuries
> that began to take their toll in the 1960s,
> and a flood of lawsuits beginning in the
> 1970s.  On the basis of past and current
> filing data, and because of a latency period
> that may last as long as 40 years for some
> asbestos related diseases, a continuing
> stream of claims can be expected.  The final
> toll of asbestos related injuries is unknown.
> Predictions have been made of 200,000
> asbestos disease deaths before the year 2000
> and as many as 265,000 by the year 2015.
>
> The most objectionable aspects of
> asbestos litigation can be briefly
> summarized:  dockets in both federal and
> state courts continue to grow; long delays
> are routine; trials are too long; the same
> issues are litigated over and over;
> transaction costs exceed the victims'
> recovery by nearly two to one; exhaustion of
> assets threatens and distorts the process;
> and future claimants may lose altogether.


In re Asbestos Prods. Liab. Litig. (No. VI), 771 F. Supp. 415,

418–19 (J.P.M.L. 1991) (quoting Report of The Judicial Conference

Ad Hoc Committee on Asbestos, 1–3 (1991)) (footnote omitted).

        Seeking solutions to the asbestos litigation crisis,

eight federal judges with significant asbestos experience wrote

---

this case); Note, And Justiciability for All?:  Future Injury
Plaintiffs and the Separation of Powers, 109 Harv. L. Rev. 1066
(1996) (addressing the justiciability of futures claims).

to the Judicial Panel on Multidistrict Litigation ("MDL Panel"), urging it to consolidate all the federal asbestos litigation in a single district. These judges argued that consolidation would "facilitate global settlements, and allow the transferee court to fully explore . . . national disposition techniques such as classes and sub-classes under Rule 23." Georgine, 157 F.R.D. at 265 (citation and internal quotations omitted). The MDL Panel agreed, transferring all pending federal court asbestos cases that were not yet on trial to the Eastern District of Pennsylvania, and assigning them to Judge Charles R. Weiner for consolidated pretrial proceedings. See In re Asbestos Prods. Liab. Litig. (No. VI), 771 F. Supp. at 424.

After the MDL Panel transfer, steering committees for the plaintiffs and defendants were formed and commenced global settlement negotiations. Judge Weiner appointed two of the class counsel in this case, Ronald Motley and Gene Locks, as co-chairs of the Plaintiffs' Steering Committee. Counsel for CCR were active participants on the Defendants' Steering Committee.

When these negotiations reached an impasse, class counsel and CCR began negotiations to resolve CCR's asbestos liability. After a year of discussions, the two sides reached a settlement agreement, and then filed this class action.

B. Proceedings in the District Court

On January 15, 1993, the named plaintiffs filed a complaint on behalf of a class consisting of (1) all persons exposed occupationally or through the occupational exposure of a

spouse or household member to asbestos-containing products or asbestos supplied by any CCR defendant, and (2) the spouses and family members of such persons, who had not filed an asbestos-related lawsuit against a CCR defendant as of the date the class action was commenced.[0]  Five of the named plaintiffs allege that they have sustained physical injuries as a result of exposure to the defendants' asbestos products.  Four named plaintiffs allege

---

[0] The complaint defines the class as follows:

> (a)  All persons (or their legal representatives) who have been exposed in the United States or its territories (or while working aboard U.S. military, merchant, or passenger ships), either occupationally or through the occupational exposure of a spouse or household member, to asbestos or to asbestos-containing products for which one or more of the Defendants may bear legal liability and who, as of January 15, 1993, reside in the United States or its territories, and who have not, as of January 15, 1993, filed a lawsuit for asbestos-related personal injury, or damage, or death in any state or federal court against the Defendant(s) (or against entities for whose actions or omissions the Defendant(s) bear legal liability).

> (b)  All spouses, parents, children, and other relatives (or their legal representatives) of the class members described in paragraph (a) above who have not, as of January 15, 1993, filed a lawsuit for the asbestos-related personal injury, or damage, or death of a class member described in paragraph (a) above in any state or federal court against the Defendant(s) (or against entities for whose actions or omissions the Defendant(s) bear legal liability).

that they have been exposed to the CCR defendants' asbestos-containing products but have not yet sustained any asbestos-related condition. On December 22, 1993, the settling parties stipulated to the substitution of Robert A. Georgine for Edward J. Carlough as the lead plaintiff, and the caption of the case has been changed accordingly. See Georgine, 157 F.R.D. at 257 n.1. We thus refer to the plaintiff class as the Georgine class.

The complaint asserts various legal theories, including (1) negligent failure to warn, (2) strict liability, (3) breach of express and implied warranty, (4) negligent infliction of emotional distress, (5) enhanced risk of disease, (6) medical monitoring, and (7) civil conspiracy. Each plaintiff seeks unspecified damages in excess of $100,000.

On the same day, the CCR defendants filed an answer, denying the allegations of the plaintiffs' class action complaint and asserting eleven affirmative defenses. Also on the same day, the plaintiffs and defendants ("the settling parties") jointly filed a motion seeking conditional class certification for purposes of settlement accompanied by a stipulation of settlement.[0] Simultaneously, the settling parties concluded another agreement: class counsel agreed to settle their inventories of pending asbestos claims -- claims that were

---

[0]Additionally, on January 15, the CCR defendants filed a third party action against their insurers, seeking a declaratory judgment that the insurers are liable for the costs of the settlement. The insurance litigation is still pending in the district court. See, e.g., Georgine v. Amchem Prods., Inc., No. 93-0215, 1994 WL 502475 (E.D. Pa. Sept. 2, 1994).

expressly excluded from the class action -- against the CCR defendants for over $200 million.

The stipulation of settlement purports to settle all present and future claims of class members for asbestos-related personal injury or wrongful death against the CCR members that were not filed before January 15, 1993. The stipulation establishes an administrative procedure that provides compensation for claimants meeting specified exposure and medical criteria. If the exposure criteria are met, the stipulation provides compensation for four categories of disease: mesothelioma, lung cancer, certain "other cancers" (including colon-rectal, laryngeal, esophageal, and stomach cancer), and "non-malignant conditions" (asbestosis and bilateral pleural thickening). The stipulation provides objective criteria for medical diagnoses. For those claimants that qualify, the stipulation fixes a range of damages that CCR will award for each disease, and places caps both on the amount that a particular victim may recover and on the number of qualifying claims that may be paid in any given year.

Claimants found to have "extraordinary" claims can be awarded more than the cap allows, but only a limited number of claims (three percent of the total number of qualified mesothelioma, lung cancer and "other cancer" claims, and up to one percent of the total number of qualified "non-malignant conditions" claims) can be found to be "extraordinary." Furthermore, the total amount of compensation available to

victims with such claims is itself capped. Payment under the settlement is not adjusted for inflation.

The stipulation does allow some claimants who qualify for payment but are dissatisfied with the settlement offered by CCR to pursue their claims in court. However, the stipulation severely limits the number of claimants who can take advantage of this option. Only two percent of the total number of mesothelioma and lung cancer claims, one percent of "other cancer" claims, and one-half of a percent of "non-malignant conditions" claims from the previous year may sue in the tort system. Although the plaintiffs are generally bound to the settlement in perpetuity, the defendants are not so limited. Each defendant may choose to withdraw from the settlement after ten years.

The claims asserted by the exposure only plaintiffs -- claims for increased risk of cancer, fear of future asbestos-related injury, and medical monitoring -- receive no payment under the stipulation of settlement. In addition, "pleural" claims, which involve asbestos-related plaques on the lungs but no physical impairment, receive no cash compensation, even though such claims regularly receive substantial monetary payments in the tort system.

On the other hand, the settlement does provide exposure-only and pleural claimants with significant benefits. First, the stipulation tolls all statutes of limitations, so that any claim that was not time-barred when the class action was commenced may be filed at any time in the future. Thus, unlike

in the tort system, where pleural claimants may have to rush to file suit on discovery of changes in the lining surrounding their lungs (before their full injuries are known), under the stipulation claimants do not submit their claims until they develop an impairing illness.  Second, the stipulation provides certain "comeback" rights, so that claimants who have been compensated for a non-malignant condition may file a second claim and receive further compensation if they later develop an asbestos-related cancer.  It is estimated that almost 100,000 claims will be paid under the settlement over the course of the next ten years.[0]

On January 29, 1993, Judge Weiner conditionally certified this opt-out class.  He then referred the matter to Judge Lowell A. Reed for the establishment of settlement procedures and the resolution of objections to the settlement.  Judge Reed held hearings on a number of aspects of the case and issued several comprehensive opinions.  On October 6, 1993, he ruled that the court had subject matter jurisdiction and that the action presented a justiciable case or controversy.  See Carlough v. Amchem Prods., Inc., 834 F. Supp. 1437 (E.D. Pa. 1993).  On October 27, 1993, he concluded that the proposed settlement satisfied a threshold level of fairness sufficient to warrant class notice and approved a notice plan.  See Carlough v. Amchem

---

[0]The terms of the Stipulation are discussed in greater detail in Georgine, 157 F.R.D. at 267-86.

<u>Prods., Inc.</u>, 158 F.R.D. 314 (E.D. Pa. 1993). We summarize the highlights of these decisions in the margin.[0]

_____

[0]First, Judge Reed rejected the objectors' contentions that exposure-only plaintiffs, who may not presently have sufficient physical harm to state a valid cause of action, lack standing to pursue this litigation. <u>Carlough</u>, 834 F. Supp. at 1446-56. He reasoned that Article III standing is not dependent upon the plaintiffs' ability to state a valid cause of action, but that it depends upon whether these plaintiffs have "suffered an injury in fact which is concrete and particularized, and actual or imminent rather than merely conjectural or hypothetical." <u>Id.</u> at 1450 (citing <u>Lujan v. Defenders of Wildlife</u>, 112 S. Ct. 2130, 2136 (1992)). He concluded that "exposure to a toxic substance constitutes sufficient injury in fact to give a plaintiff standing to sue in federal court." <u>Id</u>. at 1454.

Second, with respect to amount-in-controversy, Judge Reed noted that "the sum claimed by the plaintiff controls if the claim is apparently made in good faith," and the case will not be dismissed unless it appears to a "legal certainty" that the $50,000 amount cannot be satisfied. <u>Id.</u> at 1456 (citations and internal quotations omitted). He then rejected the objectors' argument that exposure-only plaintiffs did not meet this standard. Judge Reed held first that "it is enough that the kind of factual injuries alleged by the exposure-only plaintiffs -- physical, monetary and emotional injuries -- plainly support a claim to more than $50,000." <u>Id.</u> at 1459 (citation omitted). He also ruled that, even if he were required to do a claim-by-claim analysis of the exposure-only plaintiffs' claims, it could not be said to a legal certainty that a jury might not award $50,000 to any plaintiff. <u>See</u> <u>id.</u> at 1462.

Third, Judge Reed rejected the objectors' claim that the litigation was "collusive" -- and therefore did not present a case or controversy -- because the Stipulation of Settlement was negotiated before class counsel formally filed the complaint. <u>Id.</u> at 1462-66. He held that this case "is one involving genuinely adverse interests, but, because of the settlement, it lacks a dispute as to the remedy." <u>Id</u>. at 1465.

On October 27, 1993, Judge Reed ruled that "the proposed settlement is fair for the preliminary purpose of deciding whether to send notice to the class in that it appears to be the product of serious, informed, non-collusive negotiations, it has no obvious deficiencies, it does not improperly grant preferential treatment to class representatives or segments of the class, and it clearly falls within the range of possible approval." <u>Carlough v. Amchem Prods., Inc.</u>, 158 F.R.D. 314, 320

On February 22, 1994, after several months of pre-trial proceedings, discovery, and motions, Judge Reed commenced a hearing to assess the fairness of the settlement. The hearing took eighteen days and involved the testimony of some twenty-nine witnesses. On August 16, 1994, Judge Reed filed an opinion approving the Stipulation of Settlement and finally certifying the Georgine settlement class. In the course of his opinion, he held that the class met the requirements of Federal Rule of Civil Procedure 23, that the settlement was fair and reasonable, and that notice to the class met the requirements of Rule 23 and the Due Process Clause. See Georgine v. Amchem Prods., Inc., 157 F.R.D. 246 (E.D. Pa. 1994).[0]

The settling parties then moved for a preliminary injunction barring class members from initiating claims against any CCR defendant pending a final judgment in this case. On September 21, 1994, he granted the motion, explaining that the

---

(E.D. Pa. 1993) (footnotes omitted). He then analyzed the notice plan, concluding that the proposed notice (with certain specified modifications) "satisf[ied] the requirements of Rules 23(c)(2) and (e) and the due process clause of the Constitution." Carlough, 158 F.R.D. at 333.

Finally, Judge Reed rejected the objectors' contention that, regardless of the content or form of the notice plan, notice regarding potential future personal injury claims for past toxic exposure is per se unconstitutional, either because such claimants may not understand that they are members of the class or because they cannot make an informed opt-out decision without knowing what disease, if any, they may suffer in the future. Id. at 334-36.

[0]Judge Reed later established a new notice and opt-out period, voiding a prior notice and opt-out period, to remedy alleged improper communications made by counsel opposing the settlement. See Georgine v. Amchem Prods., Inc., 160 F.R.D. 478 (E.D. Pa. 1995).

injunction is necessary because "the cost and time expended defending claims in multiple jurisdictions would likely result in the disintegration of the Georgine settlement." Georgine v. Amchem Prods., Inc., 878 F. Supp. 716, 723 (E.D. Pa. 1994). These appeals followed.

## C. The Contentions on Appeal

Although this opinion will address only the class certification issues, these appeals have not been so circumscribed. Indeed, far from acceding to any of Judge Reed's rulings, see supra note 6, the objectors have also vigorously pressed challenges to justiciability, subject matter jurisdiction, personal jurisdiction over absent class members, and the adequacy of class notice.

First, the objectors argue that this is a feigned suit -- and thus is not a justiciable case or controversy under Article III of the Constitution -- because neither plaintiffs nor plaintiffs' counsel had any intention of litigating their "futures" claims, but merely seek approval of a result that plaintiffs and defendants have jointly pursued. This contention is supported by the fact that class counsel presented the suit and settlement together with counsel for the CCR defendants in one package, after having negotiated with CCR a side-settlement of over $200 million for cases in their "inventory." Second, the objectors contend that the exposure only plaintiffs lack standing to bring their claims because they currently suffer no actual injuries. Third, they assert that the court lacks subject matter

jurisdiction over the exposure-only plaintiffs' claims because such claims cannot exceed the $50,000 minimum required by the diversity statute. Fourth, they argue that the court cannot assert personal jurisdiction over class members lacking minimum contacts with the forum, because such class members have not had a meaningful opportunity to opt out and thus have not consented to jurisdiction. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 811-12 (1985).

Finally, the objectors have martialed a powerful three-pronged argument that, in this futures class action with virtually no delayed opt-out rights, notice to absent class members cannot meet the requirements of Rule 23 or the Constitution. See Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950). The objectors argue that notice is problematic for futures plaintiffs because (1) such plaintiffs may not know that they have been exposed to asbestos within the terms of this class action; (2) even if aware of their exposure, these plaintiffs, who suffer no physical injuries, have little reason to pay attention to class action announcements; and (3) even if class members find out about the class action and realize they fall within the class definition, they lack adequate information to properly evaluate whether to opt out of the settlement.

The settling parties counter these contentions, arguing that the jurisdiction of the district court is secure and that the strictures of due process have been satisfied. First, to rebut the objectors' argument that this suit is feigned, the

settling parties point out that the district court's resolution

of that issue in their favor rested largely on fact findings, and

that this appeal does not challenge any factual determinations of

the district court.  The settling parties also allege that,

against the background of bitter adversarial litigation that has

gone on for many years between plaintiffs and asbestos companies

(and between counsel in this case), this suit was no more or less

"collusive" than other similar actions brought and settled.

Second, regarding the existence of the requisite amount in

controversy, the settling parties cite to precedent (within a

checkered body of caselaw) holding that claims for future injury

and medical monitoring with accompanying emotional distress meet

the jurisdictional threshold.[0]

---

[0]The settling parties also contend that a prior decision in this
case, Carlough v. Amchem Prods., Inc., 10 F.3d 189 (3d Cir. 1993)
[Hereinafter Gore], decided the jurisdictional challenges raised
in this appeal.  We are unpersuaded.  After the Georgine class
action had commenced but prior to the establishment of an opt-out
period, the Gore plaintiffs (several absent members of the
Georgine class) filed a class action complaint in West Virginia
state court.  The Gore plaintiffs sought a declaration that they
were authorized to "opt out" of the Georgine action on behalf of
a West Virginia class and to initiate their own asbestos class
action.  The district court granted a preliminary injunction as
"necessary in aid of [its] jurisdiction" under the All-Writs and
Anti-Injunction Acts, enjoining the Gore plaintiffs from
prosecuting their separate class action.  On appeal to this
Court, the Gore plaintiffs argued that the district court lacked
jurisdiction to enjoin them because the district court had issued
the injunction before providing absent plaintiffs an opportunity
to opt out of the Georgine class, which is necessary to establish
personal jurisdiction over plaintiffs lacking minimum contacts
with the forum, and before the district court found that it had
subject matter jurisdiction over the Georgine action.  The panel
upheld the district court's injunction because, after issuing its
injunction, the district court established an opt-out period and
found that it had subject matter jurisdiction.  Id. at 200-01.
Although the district court should have inquired into its

Third, as to the adequacy of class notice, the settling parties submit that the class members, having the terms of the settlement before them, were in a better position to exercise a choice than the usual notice recipient who has no idea how the case will come out.  Finally, they assert, though far less convincingly in the wake of GM Trucks, that the requisites of Rule 23 are met as well.

Although the existence of justiciability and subject matter jurisdiction are not free from doubt, and although we have serious concerns as to the constitutional adequacy of class notice, we decline to reach these issues, and pass on to the class certification issues.  The class certification issues are dispositive, and we believe it prudent not to decide issues unnecessary to the disposition of the case, especially when many of these issues implicate constitutional questions.  See, e.g.,

---

jurisdiction before issuing the injunction, we held that the district court's subsequent orders constituted an "initial jurisdictional inquiry" necessary to support its preliminary injunction.  Id. at 201.

Given its unique posture, we read Gore very narrowly. Gore held that a district court may issue a preliminary injunction against an attempt to opt out en masse -- which threatens to completely undermine the federal class action -- without a full-scale determination of its jurisdiction.  Where a federal class action is threatened with destruction before the notice and opt-out period even commences, an "initial jurisdictional inquiry" -- which "may be based on the information reasonably and immediately available to the court," id. -- is sufficient to support the court's jurisdiction to issue a protective preliminary injunction.  Gore did not reach the question raised in this case:  the propriety of the district court's assertion of jurisdiction, after completion of the notice and opt-out period, to enjoin individual plaintiffs from pursuing collateral litigation.

<u>Spector Motor Serv., Inc. v. McLaughlin</u>, 323 U.S. 101, 105 (1944) (expressing the rule that courts will avoid constitutional questions when possible). In doing so, we offend no principle of constitutional law, for the jurisdictional issues in this case would not exist but for the certification of this class action. Absent the class certification, there is no need for a determination of jurisdiction over futures claims, the justiciability of such claims, the adequacy of notice, or the propriety of a nationwide protective injunction. Moreover, a court need not reach difficult questions of jurisdiction when the case can be resolved on some other ground in favor of the same party. See <u>Norton v. Mathews</u>, 427 U.S. 524, 528-33 (1976); <u>Elkin v. Fauver</u>, 969 F.2d 48, 52 n.1 (3d Cir.), <u>cert. denied</u>, 506 U.S. 977 (1992); <u>United States v. Weathersby</u>, 958 F.2d 65, 66 (5th Cir. 1992); <u>Wolder v. United States</u>, 807 F.2d 1506, 1507 (9th Cir. 1987).

II.  APPELLATE JURISDICTION

Although we deem it wise not to decide most of the jurisdictional issues posed by this case, we are obliged to consider the threshold question whether we have appellate jurisdiction to review the propriety, under Federal Rule of Civil Procedure 23, of the district court's class certification.

Although the district court has approved the stipulation of settlement and certified the <u>Georgine</u> settlement class, it has not entered a final judgment because the stipulation of settlement is expressly conditioned on the CCR's

insurers assuming liability for the settlement. See supra note 4. This is an appeal of the district court's September 22, 1994, preliminary injunction, which prohibits Georgine class members from pursuing claims for asbestos-related personal injury in any other court pending the issuance of a final order. The district court issued the preliminary injunction pursuant to the All-Writs Act, 28 U.S.C. § 1651, and the Anti-Injunction Act, 28 U.S.C. §2283, which provide authority to enjoin collateral litigation if "necessary in aid" of the court's jurisdiction. See Gore, 10 F.3d 189, 201-04 (3d Cir. 1993). The district court found that the injunction is necessary because collateral litigation would undermine implementation of the settlement.

An order granting or denying class certification is generally not appealable until a final order has been issued. See Coopers & Lybrand v. Livesay, 437 U.S. 463 (1978) (class certification not appealable under 28 U.S.C. § 1291); Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478 (1978) (class certification not appealable under 28 U.S.C. § 1292(a)(1)). This Court has jurisdiction, of course, under 28 U.S.C. § 1292(a)(1) to review the preliminary injunction issued by the district court. We further conclude that we have pendent appellate jurisdiction to review class certification.

In Kershner v. Mazurkiewicz, 670 F.2d 440 (3d Cir. 1982) (in banc), we held that class certification is reviewable on appeal from issuance of a preliminary injunction if "the preliminary injunction cannot properly be decided without reference to the class certification question." Id. at 449. We

reasoned that if the propriety of class certification "directly controls disposition of the [injunction], or [if] the issues are, in some way, inextricably bound[,] then both issues must be addressed in order to resolve properly the section 1292(a)(1) preliminary injunction." Id. (emphasis in original) (footnote omitted); accord Hoxworth v. Blinder, Robinson & Co., 903 F.2d 186, 208-09 (3d Cir. 1990). To do otherwise would impinge on the right to a 1292(a)(1) appeal. See Kershner, 670 F.2d at 449.

In this case, class certification "directly controls disposition of the [injunction]." The entire basis for the district court's injunction is to protect the underlying class action. If the class was not properly certified, the district court was without authority to issue its preliminary injunction. To give full effect to the appellants' right to review of the injunction, we must reach class certification. We also note that concerns that might militate against review are not present in this case. Most notably, there is no indication that the district court might alter its class certification order. Compare Kershner, 670 F.2d at 449 (expressing this concern).

III. CLASS CERTIFICATION

To obtain class certification, plaintiffs must satisfy all of the requirements of Rule 23(a) and come within one provision of Rule 23(b). See Wetzel v. Liberty Mutual Ins. Co., 508 F.2d 239, 248 (3d Cir.), cert. denied, 421 U.S. 1011. Rule 23(a) mandates a showing of (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).

We held in GM Trucks that, although class actions may be certified for settlement purposes only, Rule 23(a)'s requirements must be satisfied as if the case were going to be litigated. See 55 F.3d 768, 799-800 (3d Cir.), cert. denied sub nom. General Motors Corp. v. French, 116 S. Ct. 88 (1995). Strict application of the criteria is mandated, even when the parties have reached a proposed settlement, because

> Rule 23 is designed to assure that courts will identify the common interests of class members and evaluate the named plaintiff's and counsel's ability to fairly and adequately protect class interests . . . . To allow lower standards for the requisites of the rule in the face of the hydraulic pressures confronted by courts adjudicating very large and complex actions would erode the protection afforded by the rule almost entirely.

Id. at 799 (citation omitted). Therefore, despite the possibility that settlement-only class actions might serve the "useful purpose of ridding the courts" of the "albatross[]" represented by mass tort actions, the rule in this circuit is that settlement class certification is not permissible unless the case would have been "triable in class form." Id.

In addition to satisfying the Rule 23(a) requirements, a putative class must meet the conditions of one of the parts of subsection (b). In this case, the settling parties seek certification pursuant to 23(b)(3), which requires findings of predominance and superiority -- i.e., "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3).

In GM Trucks we reserved the question whether, in the case of settlement classes,[0] the fact of settlement may be considered in applying the 23(b)(3) requirements. 55 F.3d at 796. The settling parties assert that in contrast to the 23(a) factors, which protect absent class members' rights, the 23(b)(3) factors promote the "fair and efficient resolution of justice." The fact of settlement, they argue, goes to the heart of Rule 23(b)(3)'s "manageability concerns" and thus must be considered.

We disagree. The 23(b)(3) requirements protect the same interests in fairness and efficiency as the 23(a)

---

[0]A settlement class is a device whereby the court postpones formal class certification until the parties have successfully concluded a settlement. If settlement negotiations succeed, the court certifies the class for settlement purposes only and sends a combined notice of the commencement of the class action and the settlement to the class members. By conditionally certifying the class for settlement purposes only, the court allows the defendant to challenge class certification in the event that the settlement falls apart. For a more detailed description of settlement classes and their costs and benefits, see GM Trucks, 55 F.3d at 786-92.

requirements. More importantly, we based our pronouncement in GM Trucks that "a class is a class is a class" in large part on the fact that "[t]here is no language in the rule that can be read to authorize separate, liberalized criteria for settlement classes." Id. at 799. Whatever the Advisory Committee on Civil Rules (and, of course, Congress) may ultimately determine the better rule to be, we do not believe that the drafters of the present rule included a more liberal standard for 23(b)(3).[0]

The district court did not have the benefit of GM Trucks when it decided the Rule 23 issues, and it applied an incorrect standard. First, it took the view that Rule 23 requirements are lower for settlement classes. See, e.g.,

---

[0] The settling parties argue that In re School Asbestos Litig., 789 F.2d 996 (3d Cir.), cert. denied sub nom. Celotex Corp. v. School Dist. of Lancaster, 479 U.S. 852, and National Gypsum Co. v. School Dist. of Lancaster, 479 U.S. 915 (1986), requires the Court to take the possibility of settlement into account in applying Rule 23(b)(3). We reject this contention. In re School Asbestos Litig. stated, in relevant part:

> Concentration of individual damage suits in
> one forum can lead to formidable problems,
> but the realities of litigation should not be
> overlooked in theoretical musings. Most tort
> cases settle, and the preliminary
> maneuverings in litigation today are designed
> as much, if not more, for settlement purposes
> than for trial. Settlements of class actions
> often result in savings for all concerned.

Id. at 1009. This statement, whatever its import, does not constitute a holding. Its language is broad, general, and grammatically permissive. Moreover, this statement appears in a section in which the Court does both a Rule 23(a) and 23(b) analysis. Thus, insofar as In re School Asbetos Litig. requires a consideration of settlement, this requirement would apply to Rule 23(a) as well as 23(b). But GM Trucks held that Rule 23(a) must be applied without reference to settlement, thereby rejecting the settling parties' argument.

<u>Georgine v. Amchem Prods.</u>, 157 F.R.D. 246, 315 (E.D. Pa. 1994) ("The Rule 23 requirements for class certification . . . are often more readily satisfied in the settlement context because the issues for resolution by the Court are more limited than in the litigation context.").  Second, the district court erred by relying in significant part on the presence of the settlement to satisfy the Rule 23(a) requirements of commonality, typicality, and adequacy of representation, and the Rule 23(b)(3) requirements of predominance and superiority.  See <u>Georgine</u>, 157 F.R.D. at 314–19.  But each of these requirements must be satisfied without taking into account the settlement, and as if the action were going to be litigated.  See <u>GM Trucks</u>, 55 F.3d at 799.

With a proper understanding of the Rule 23 factors, we turn now to their application.  For the reasons explained below, we conclude that this class, considered as a litigation class, cannot meet the 23(a) requirements of typicality and adequacy of representation, nor the 23(b) requirements of predominance and superiority.[0]  We will discuss each of these requirements.  Instead of addressing them in the conventional sequence, we will use a functional arrangement, linking related provisions.

## A.  Commonality & Predominance

Rule 23(a)(2) requires that "there are questions of law or fact common to the class," and Rule 23(b)(3) requires "that

_____

[0]This class, which may stretch into the millions, easily satisfies the numerosity requirement.

the questions of law or fact common to the members of the class predominate over any questions affecting only individual members." FED. R. CIV. P. 23. Because 23(b)(3)'s predominance requirement incorporates the commonality requirement, we will treat them together.

All of the putative class members assert claims based on exposure to the asbestos sold by the CCR defendants. The capacity of asbestos fibers to cause physical injury is surely a common question, though that issue was settled long ago. See, e.g., In re School Asbestos Litig., 789 F.2d 996, 1000 (3d Cir.), cert. denied sub nom. Celotex Corp. v. School Dist. of Lancaster, 479 U.S. 852, and National Gypsum Co. v. School Dist. of Lancaster, 479 U.S. 915 (1986). Although not identified by the district court, there may be several other common questions, such as whether the defendants had knowledge of the hazards of asbestos, whether the defendants adequately tested their asbestos products, and whether the warnings accompanying their products were adequate. See id. at 1009.[0]

However, beyond these broad issues, the class members' claims vary widely in character. Class members were exposed to different asbestos-containing products, for different amounts of time, in different ways, and over different periods. Some class members suffer no physical injury or have only asymptomatic pleural changes, while others suffer from lung cancer, disabling

---

[0] The only common questions identified by the district court are (1) the fairness of the settlement -- an impermissible consideration -- and (2) the harmfulness of asbestos exposure. See Georgine, 157 F.R.D. at 316.

asbestosis, or from mesothelioma -- a disease which, despite a latency period of approximately fifteen to forty years, generally kills its victims within two years after they become symptomatic. Each has a different history of cigarette smoking, a factor that complicates the causation inquiry.

The futures plaintiffs especially share little in common, either with each other or with the presently injured class members. It is unclear whether they will contract asbestos-related disease and, if so, what disease each will suffer. They will also incur different medical expenses because their monitoring and treatment will depend on singular circumstances and individual medical histories.

These factual differences translate into significant legal differences. Differences in amount of exposure and nexus between exposure and injury lead to disparate applications of legal rules, including matters of causation, comparative fault, and the types of damages available to each plaintiff.

Furthermore, because we must apply an individualized choice of law analysis to each plaintiff's claims, see Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 823 (1985) (constitutional limitations on choice of law apply even in nationwide class actions), the proliferation of disparate factual and legal issues is compounded exponentially. The states have different rules governing the whole range of issues raised by the plaintiffs' claims: viability of futures claims; availability of causes of action for medical monitoring, increased risk of cancer, and fear of future injury; causation; the type of proof necessary to prove

asbestos exposure; statutes of limitations; joint and several liability; and comparative/contributory negligence. In short, the number of uncommon issues in this humongous class action, with perhaps as many as a million class members, is colossal.

The settling parties point out that our cases have sometimes stated a very low threshold for commonality. In Neal v. Casey, 43 F.3d 48, 56 (3d Cir. 1994), for example, we stated that "[t]he commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." And, in In re School Asbestos Litigation, 789 F.2d at 1010, we stated that "the 'threshold of commonality is not high.'" (citation omitted). But those cases are quite different from this one. Neal involved a class action for injunctive relief, and thus raised infinitely fewer individualized issues than are posed here. And In re School Asbestos Litigation upheld the certification of a nationwide class action for damages associated with asbestos removal explicitly on the ground that case involved only property damages. See, e.g., 789 F.2d at 1009 ("[T]he claims are limited to property damage, and school districts are unlikely to have strong emotional ties to the litigation.").[0] We believe that the

_____

[0]Moreover, In re School Asbestos Litigation involved vastly fewer individualized questions than this one. Cf. id. at 1010 (noting that the complexity of causation questions in personal injury suits is much greater than for property damage suits). And, choice of law arguably did not greatly magnify the number of disparate issues. Class counsel had made a credible argument that the applicable law of the different states could be broken into approximately four patterns, see id., and we noted that the district court could decertify the class if this prediction

commonality barrier is higher in a personal injury damages class action, like this one, that seeks to resolve <u>all</u> issues, including noncommon issues, of liability and damages.

Nevertheless, we do not hold that this class fails the commonality requirement because the test of commonality is subsumed by the predominance requirement, which this class cannot conceivably meet. We proceed cautiously here because establishing a high threshold for commonality might have repercussions for class actions very different from this case, such as a Rule 23(b)(1)(B) limited fund class action, in which the action presented claimants with their only chance at recovery.

Turning to predominance, we hold that the limited common issues identified, primarily the single question of the harmfulness of asbestos, cannot satisfy the predominance requirement in this case. Indeed, it does not even come close. We start by noting the Advisory Committee's well-known caution against certifying class actions involving mass torts:

> A "mass accident" resulting in injuries to numerous persons is ordinarily not appropriate for a class action because of the likelihood that significant questions, not only of damages but of liability and defenses of liability, would be present, affecting the individuals in different ways. In these circumstances an action conducted nominally as a class action would degenerate in practice into multiple lawsuits separately tried.

FED. R. CIV. P. 23(b)(3) Advisory Notes to 1966 Amendment.

---

proved to be faulty. Of course, this case could not be broken into anywhere near that small a number of patterns.

While, notwithstanding this cautionary note, mass torts involving a single accident are sometimes susceptible to Rule 23(b)(3) class action treatment, the individualized issues can become overwhelming in actions involving long-term mass torts (i.e., those which do not arise out of a single accident).  As the Ninth Circuit stated in In re N.D. Cal. Dalkon Shield IUD Prods. Liab. Litig., 693 F.2d 847 (9th Cir. 1982), cert. denied sub nom. A.H. Robins Co., Inc. v. Abed, 459 U.S. 1171 (1983):

> In the typical mass tort situation, such as an airplane crash or a cruise ship food poisoning, proximate cause can be determined on a class-wide basis because the cause of the common disaster is the same for each of the plaintiffs.
>
> In products liability actions, however, individual issues may outnumber common issues.  No single happening or accident occurs to cause similar types of physical harm or property damage.  No one set of operative facts establishes liability.  No single proximate cause applies equally to each potential class member and each defendant.  Furthermore, the alleged tortfeasor's affirmative defenses (such as failure to follow directions, assumption of the risk, contributory negligence, and the statute of limitations) may depend on facts peculiar to each plaintiff's case.

Id. at 853 (citations omitted).

Other cases are in accord.  See, e.g., Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988) ("In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and individual issues outnumber common issues, the

district court should properly question the appropriateness of a class action for resolving the controversy."); cf. Watson v. Shell Oil Co., 979 F.2d 1014, 1023 (5th Cir. 1992) (approving a class of some 18,000 plaintiffs injured in an oil refinery explosion but noting that "[t]his litigation differs markedly from toxic tort cases such as Jenkins, Fibreboard, and Tetracycline, in which numerous plaintiffs suffer varying types of injury at different times and through different causal mechanisms, thereby creating many separate issues"), reh'g granted, 990 F.2d 805 (5th Cir. 1993), appeal dismissed, 53 F.3d 663 (5th Cir. 1994). These concerns recently led the Sixth Circuit to decertify a nationwide class action for injuries caused by penile prostheses. See In re American Medical Sys., Inc., 75 F.3d 1069, 1081 (6th Cir. 1996) ("Proofs as to strict liability, negligence, failure to warn, breach of express and implied warranties will also vary from plaintiff to plaintiff because complications with an AMS device may be due to a variety of factors . . . .").

Although some courts have approved class certification of long-term mass torts, these cases have generally involved the centrality of a single issue. See In re "Agent Orange" Prod. Liab. Litig., 818 F.2d 145, 166-67 (2d Cir. 1987) (expressing concern over the difficulties of managing mass tort suits but finding that class certification was justified because of the centrality of the military contractor defense), cert. denied sub nom. Pinkney v. Dow Chem. Co., 484 U.S. 1004 (1988); In re A.H. Robins Co., Inc., 880 F.2d 709, 747 (4th Cir.) ("Just as the

military [contractor] defense was central to the case in <u>Agent Orange</u>, so the question whether Aetna was a joint tortfeasor here was the critical issue common to all the cases against Aetna, and one which, if not established, would dispose of the entire litigation."), <u>cert. denied sub nom.</u> <u>Anderson v. Aetna Casualty and Sur. Co.</u>, 493 U.S. 959 (1989).  This case, of course, lacks any single central issue.

The lack of predominant common issues has been a particular problem in asbestos-related class actions.  For example, in <u>In re Fibreboard Corp.</u>, 893 F.2d 706 (5th Cir. 1990), the Fifth Circuit stated:

> The 2,990 [asbestos personal injury] class members cannot be certified for trial as proposed under Rule 23(b)(3).  Rule 23(b)(3) requires that "the questions of law or fact common to the members of the class predominate over any questions affecting individual members."  There are too many disparities among the various plaintiffs for their common concerns to predominate.  The plaintiffs suffer from different diseases, some of which are more likely to have been caused by asbestos than others.  The plaintiffs were exposed to asbestos in various manners and to varying degrees.  The plaintiffs' lifestyles differed in material respects.  To create the requisite commonality for trial, the discrete components of the class members' claims and the asbestos manufacturers' defenses must be submerged.

<u>Id.</u> at 712 (citations omitted).  In <u>In re Temple</u>, 851 F.2d 1269 (11th Cir. 1988), the Eleventh Circuit expressed similar concerns:

> Although the record on commonality and typicality of the class is sparse, the district court's order on its face encompasses a potentially wide variety of

different conditions caused by numerous
different types of exposures.  We have no
indication that claimants' experiences share
any factors other than asbestos and Raymark
in common.

Id. at 1273 (footnote and citations omitted).

We also draw instruction from Yandle v. PPG Indus.,
Inc., 65 F.R.D. 566 (E.D. Tex. 1974), where the district court
refused to certify a much more narrowly circumscribed asbestos
class action -- one brought by former employees of an asbestos
plant.  The court stated:

[T]he Pittsburgh Corning plant was in
operation in Tyler for a ten year period,
during which some 570 persons were employed
for different periods of time.  These
employees worked in various positions at the
plant, and some were exposed to greater
concentrations of asbestos dust than were
others.  Of these employees it is only
natural that some may have had occupational
diseases when they entered their employment
for Pittsburgh Corning.  There are other
issues that will be peculiar to each
plaintiff and will predominate in this case,
such as:  The employee's knowledge and
appreciation of the danger of breathing
asbestos dust and further, whether the
employee was given a respirator and whether
he used it or refused to use it. . . .

Additionally, the plaintiffs have
asserted various theories of recovery against
the defendants, and the nine defendants have
alleged differing affirmative defenses
against the plaintiffs.  For example, the
statute of limitations may bar some
plaintiffs, but not others.  During the ten
year period the state of medical knowledge
was changing, which has a significant bearing
on the defendants' duty to warn of dangers.
Taking all these factors into consideration,
the Court is convinced that the number of
uncommon questions of law and fact would
predominate over the common questions, and
the case would therefore 'degenerate . . .
into multiple lawsuits separately tried.'

Id. at 570-71.

Many of the cases cited by the settling parties in support of class certification are distinguishable because they involved only partial certification of common issues. See Central Wesleyan College v. W.R. Grace & Co., 6 F.3d 177, 184 (4th Cir. 1993) ("[T]he district court exercised its discretion under Fed. R. Civ. P. 23(c)(1) and 23(c)(4)(A) to certify the class conditionally . . . on eight common issues."); Jenkins v. Raymark Indus., Inc., 782 F.2d 468, 471 (5th Cir.) ("Accordingly, [the district court] certified the class as to the common questions, ordering them resolved for the class by a class action jury."), reh'g denied, 785 F.2d 1034 (5th Cir. 1986); Payton v. Abbott Labs, 83 F.R.D. 382, 386 (D. Mass. 1979) (certifying class as to limited common issues), vacated, 100 F.R.D. 336 (D. Mass. 1983). Other cases relied on by the settling parties are mass tort cases where it appeared possible to try a number of common issues and leave the individual issues to trials of small groups of plaintiffs. See, e.g., Sterling v. Velsicol Chem. Corp., 855 F.2d 1188, 1197 (6th Cir. 1988) ("[I]ndividual members of the class still will be required to submit evidence concerning their particularized damage claims in subsequent proceedings."). These cases did not seek to resolve anywhere near the number of individual issues presented in this case.

In view of the factors set forth at pages 35-36, and for the reasons stated on pages 36-42, we conclude that this class fails the test of predominance. Even if we were to assume that some issues common to the class beyond the essentially

settled question of the harmfulness of asbestos exposure remain, the huge number of important individualized issues overwhelm any common questions. Given the multiplicity of individualized factual and legal issues, magnified by choice of law considerations, we can by no means conclude "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members."

## B.  Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). The adequacy of representation inquiry has two components designed to ensure that absentees' interests are fully pursued. First, the interests of the named plaintiffs must be sufficiently aligned with those of the absentees. GM Trucks, 55 F.3d at 800. This component includes an inquiry into potential conflicts among various members of the class, see id. at 800-01, because the named plaintiffs' interests cannot align with those of absent class members if the interests of different class members are not themselves in alignment. Second, class counsel must be qualified and must serve the interests of the entire class. Id. at 801.

Although questions have been raised concerning the second prong of the inquiry, we do not resolve them here. As we have briefly noted above, the objectors have forcefully argued that class counsel cannot adequately represent the class because of a conflict of interest. In the eyes of the objectors, class

counsel have brought a collusive action on behalf of the CCR defendants after having been paid over $200 million to settle their inventory of previously filed cases. The objectors also adduce evidence that class counsel, as part of the settlement, have abjured any intention to litigate the claims of any futures plaintiffs. These allegations are, of course, rife with ethical overtones, which have been vigorously debated in the academy. See Symposium, Mass Tortes: Serving Up Just Desserts, 80 Cornell L. Rev. 811 (1995). However, Judge Reed resolved this issue in favor of class counsel largely on the basis of fact findings that the objectors have not challenged. See Georgine, 157 F.R.D. at 326-330.

As to the first prong of the inquiry, however, we conclude that serious intra-class conflicts preclude this class from meeting the adequacy of representation requirement. The district court is certainly correct that "the members of the class are united in seeking the maximum possible recovery for their asbestos-related claims." Georgine, 157 F.R.D. at 317 (citation omitted). But the settlement does more than simply provide a general recovery fund. Rather, it makes important judgments on how recovery is to be allocated among different kinds of plaintiffs, decisions that necessarily favor some claimants over others. For example, under the settlement many kinds of claimants (e.g., those with asymptomatic pleural thickening) get no monetary award at all. The settlement makes no provision for medical monitoring or for payment for loss of consortium. The back-end opt out is limited to a few persons per

year.  The settlement relegates those who are unlucky enough to contract mesothelioma in ten or fifteen years to a modest recovery, whereas the average recovery of mesothelioma plaintiffs in the tort system runs into the millions of dollars.  In short, the settlement makes numerous decisions on which the interests of different types of class members are at odds.

The most salient conflict in this class action is between the presently injured and futures plaintiffs.  As rational actors, those who are not yet injured would want reduced current payouts (through caps on compensation awards and limits on the number of claims that can be paid each year).  The futures plaintiffs should also be interested in protection against inflation, in not having preset limits on how many cases can be handled, and in limiting the ability of defendant companies to exit the settlement.  Moreover, in terms of the structure of the alternative dispute resolution mechanism established by the settlement, they should desire causation provisions that can keep pace with changing science and medicine, rather than freezing in place the science of 1993.  Finally, because of the difficulty in forecasting what their futures hold, they would probably desire a delayed opt out like the one employed in Bowling v. Pfizer, Inc., 143 F.R.D. 141, 150 (S.D. Ohio 1992) (heart valve settlement allows claimants who ultimately experience heart valve fracture to reject guaranteed compensation and sue for damages at that time).

In contrast, those who are currently injured would rationally want to maximize current payouts.  Furthermore,

currently injured plaintiffs would care little about inflation-protection.  The delayed opt out desired by futures plaintiffs would also be of little interest to the presently injured; indeed, their interests are against such an opt out as the more people locked into the settlement, the more likely it is to survive.[0]  In sum, presently injured class representatives cannot adequately represent the futures plaintiffs' interests and vice versa.

This conflict (as well as other conflicts among different types of claimants) precludes a finding of adequacy of representation.  The class is not unlike the one in GM Trucks, where a conflict between individual and fleet truck owners prevented a finding of adequacy of representation.  See GM Trucks, 55 F.3d at 801 ("[W]e must be concerned that the individual owners had no incentive to maximize the recovery of the government entities; they could skew the terms of the settlement to their own benefit.").

Absent structural protections to assure that differently situated plaintiffs negotiate for their own unique interests, the fact that plaintiffs of different types were among the named plaintiffs does not rectify the conflict.  This principle was explained by the Second Circuit in In re Joint

[0] The conflict between futures and presently injured plaintiffs is obvious.  Consider, for example, the deposition testimony of representative plaintiff Anna Baumgartner, whose husband died of mesothelioma.  She testified that the "pleurals," i.e., people who suffer only pleural thickening, and who remain uncompensated under the settlement, "don't deserve to be compensated by anyone," despite the fact that such plaintiffs currently win large awards in the tort system.

Eastern & Southern District Asbestos Litigation, 982 F.2d 721 (2d Cir. 1992), modified sub nom. In re Findley, 993 F.2d 7 (2d Cir. 1993), a case arising out of the Manville Bankruptcy reorganization.  In addressing a conflict created by placing both asbestos victims and co-defendant manufacturers in the same subclass, the court observed, "Their interests are profoundly adverse to each other.  The health claimants wish to receive as much as possible from the co-defendant manufacturers, and the latter wish to hold their payment obligations to a minimum."  Id. at 739.  The court concluded,

> The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class.  But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups.

Id. at 743.  The lack of any structural protections in this case thwarted the adequate representation of the disparate groups of plaintiffs.

C.  Typicality

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  FED. R. CIV. P. 23.  The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees.  See Neal v. Casey, 43 F.3d 48, 57 (3d Cir.

1994); Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir.), cert. denied sub nom. Weinstein v. Eisenberg, 474 U.S. 946, and Wasserstrom v. Eisenberg, 474 U.S. 946, and Pelino, Wasserstrom, Chucas and Monteverde, P.C. v. Eisenberg, 474 U.S. 946 (1985). The inquiry assesses whether the named plaintiffs have incentives that align with those of absent class members so that the absentees' interests will be fairly represented. See Neal, 43 F.3d at 57.

Some commentators believe that the concepts of commonality and typicality merge. See 7A Charles A. Wright, et al., Federal Practice and Procedure § 1764, at 243-47 (1986). Both criteria, to be sure, seek to assure that the action can be practically and efficiently maintained and that the interests of the absentees will be fairly and adequately represented. See General Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 157 n.13 (1982). But despite their similarity, commonality and typicality are distinct requirements under Rule 23. See Hassine v. Jeffes, 846 F.2d 169, 176 n.4 (3d Cir. 1988) ("'[C]ommonality' like 'numerosity' evaluates the sufficiency of the class itself, and 'typicality' like 'adequacy of representation' evaluates the sufficiency of the named plaintiff . . . ."); Weiss v. York Hosp., 745 F.2d 786, 810 n.36 (3d Cir. 1984), cert. denied, 470 U.S. 1060, and cert. denied sub nom. Medical and Dental Staff of York Hospital v. Weiss, 470 U.S. 1060 (1985). We think that typicality is more akin to adequacy of representation: both look to the potential for conflicts in the class.

As our discussion of commonality and predominance make clear, this class is a hodgepodge of factually as well as legally different plaintiffs. Moreover, as our discussion of adequacy of representation shows, these differences create problematic conflicts of interest among different members of the class. These problems lead us to hold that no set of representatives can be "typical" of this class. Even though the named plaintiffs include a fairly representative mix of futures and injured plaintiffs, the underlying lack of commonality and attendant conflicts necessarily destroy the possibility of typicality. See In re American Medical Systems, Inc., 75 F.3d 1069, 1082 (6th Cir. 1996) ("[W]e know from the amended complaint that each plaintiff used a different model, and each experienced a distinct difficulty. . . . These allegations fail to establish a claim typical to each other, let alone a class."). The claims of the named futures plaintiffs are not typical of the injured class members, and, conversely, the claims of the named injured plaintiffs are not typical of the futures class members.

Even if this class included only futures plaintiffs, we would be skeptical that any representative could be deemed typical of the class. In addition to the problems created by differences in medical monitoring costs, the course of each plaintiff's future is completely uncertain. As we pointed out in our discussion of commonality, some plaintiffs may ultimately contract mesothelioma, some may get asbestosis, some will suffer less serious diseases, and some will incur little or no physical impairments. Given these uncertainties, which will ultimately

turn into vastly different outcomes, the futures plaintiffs share too little in common to generate a typical representative. It is simply impossible to say that the legal theories of named plaintiffs are not in conflict with those of the absentees, see Neal, 43 F.3d at 57; Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985), or that the named plaintiffs have incentives that align with those of absent class members, see Neal, 43 F.3d at 57.

D. Superiority

Rule 23(b)(3) requires, in addition to predominance, "that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b)(3). The rule asks us to balance, in terms of fairness and efficiency, the merits of a class action against those of "alternative available methods" of adjudication. See Katz v. Carte Blanche Corp., 496 F.2d 747, 757 (3d Cir.) (en banc), cert. denied, 419 U.S. 885 (1974). We conclude that in this case a class action has serious problems, which, when compared to other means of adjudication, are not outweighed by its advantages.

The proposed class action suffers serious problems in both efficiency and fairness. In terms of efficiency, a class of this magnitude and complexity could not be tried. There are simply too many uncommon issues, and the number of class members is surely too large. Considered as a litigation class, then, the

difficulties likely to be encountered in the management of this action are insurmountable.  See FED. R. CIV. P. 23(b)(3)(D).[0]

This class action also suffers from serious problems in the fairness it accords to the plaintiffs.  Each plaintiff has a significant interest in individually controlling the prosecution of separate actions.  See supra note 15 (FED. R. CIV. P. 23(b)(3)(A)).  This is not a case where "the amounts at stake for individuals [are] so small that separate suits would be impracticable."  FED. R. CIV. P. 23(b)(3) Advisory Notes to 1966 Amendment.  Rather, this action involves claims for personal injury and death -- claims that have a significant impact on the lives of the plaintiffs and that frequently receive huge awards in the tort system.  See Yandle v. PPG Indus., Inc., 65 F.R.D. 566, 572 (E.D. Tex. 1974) ("[T]he court finds that the members of the purported class have a vital interest in controlling their own litigation because it involves serious personal injuries and death in some cases.").  Plaintiffs have a substantial stake in making individual decisions on whether and when to settle.

---

[0]Rule 23(b)(3) specifically directs the court to consider:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; [and] (D) the difficulties likely to be encountered in the management of a class action.

FED. R. CIV. P. 23(b)(3).

Furthermore, in this class action, plaintiffs may become bound to the settlement even if they are unaware of the class action or lack sufficient information to evaluate it. Problems in adequately notifying and informing exposure-only plaintiffs of what is at stake in this class action may be insurmountable. First, exposure-only plaintiffs may not know that they have been exposed to asbestos within the terms of this class action. Many, especially the spouses of the occupationally exposed, may have no knowledge of the exposure. For example, class representatives LaVerne Winbun and Nafssica Kekrides did not learn that their husbands had been occupationally exposed to asbestos until the men contracted mesothelioma. Second, class members who know of their exposure but manifest no physical disease may pay little attention to class action announcements. Without physical injuries, people are unlikely to be on notice that they can give up causes of action that have not yet accrued. Third, even if class members find out about the class action and realize they fall within the class definition, they may lack adequate information to properly evaluate whether to opt out of the settlement.[0]

To amplify, the fairness concerns created by the difficulties in providing adequate notice are especially serious because exposure-only plaintiffs may eventually contract a fatal

---

[0]Of course, these concerns would be alleviated to the extent the class action provided for an opt-in rather than opt-out procedure, or allowed plaintiffs to opt-out after they contract a disease. But this case, encompassing a huge number of futures plaintiffs, is an opt-out class action in which back-ended opt outs are greatly limited.

disease, mesothelioma, from only incidental exposure to asbestos. Although only a small fraction of exposure-only plaintiffs will develop mesothelioma, the disease is presently always fatal, generally within two years of diagnosis. Prior to death, mesothelioma victims invariably suffer great pain and disability. Mesothelioma can be caused by slight and incidental exposure to asbestos fibers. The disease has been known to occur in persons who lived with an asbestos-exposed parent, or in household members who washed the clothes of people who worked with asbestos. Unlike other asbestos-related cancers, mesothelioma has only one medically established cause: asbestos exposure. The unpredictability of mesothelioma is further exacerbated by the long latency period between exposure to asbestos and the onset of the disease, typically between fifteen to forty years. As a result, persons contracting the disease today may have little or no knowledge or memory of being exposed. It is unrealistic to expect every individual with incidental exposure to asbestos to realize that he or she could someday contract a deadly disease and make a reasoned decision about whether to stay in this class action.

We make no decision on whether the Constitution or Rule 23 prohibits binding futures plaintiffs to a 23(b)(3) opt-out class action. However, it is obvious that if this class action settlement were approved, some plaintiffs would be bound despite a complete lack of knowledge of the existence or terms of the class action. It is equally obvious that this situation raises serious fairness concerns. Thus, a class action would need

significant advantages over alternative means of adjudication before it could become a "superior" way to resolve this case. See Yandle, 65 F.R.D. at 572 (stating, as a reason the superiority requirement was not satisfied, that "because of the nature of the injuries claimed, there may be persons that might neglect to 'opt-out' of the class, and then discover some years in the future that they have contracted asbestosis, lung cancer or other pulmonary disease").

These advantages are lacking here. Although individual trials for all claimants may be wholly inefficient, that is not the only alternative. A series of statewide or more narrowly defined adjudications, either through consolidation under Rule 42(a) or as class actions under Rule 23, would seem preferable. See also William W Schwarzer, Structuring Multiclaim Litigation: Should Rule 23 Be Revised?, 94 Mich. L. Rev. 1250, 1264 (1996) ("These alternatives 'are hardly confined to the class action, on the one side, and individual uncoordinated lawsuits, on the other.'") (quoting Benjamin Kaplan, Continuing Work of the Civil Committee:  1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv. L. Rev. 356, 386 (1967)).

E.  Summary and Observations

We have concluded that the class certified by the district court cannot pass muster under Rule 23 because it fails the typicality and adequacy of representation requirements of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b).  Indeed, GM Trucks requires an order

of vacatur on these facts.  Moreover, we cannot conceive of how any class of this magnitude could be certified.

The desirability of innovation in the management of mass tort litigation does not escape the collective judicial experience of the panel.  But reform must come from the policy-makers, not the courts.  Such reform efforts are not, needless to say, without problems, and it is unclear through what mechanism such reform might best be effected.  The most direct and encompassing solution would be legislative action.  The Congress, after appropriate study and hearings, might authorize the kind of class action that would facilitate the global settlement sought here.  Although we have not adjudicated the due process issues raised, we trust that Congress would deal with futures claims in a way that would maximize opt-out rights and minimize due process concerns that could undermine its work.  On the other hand, congressional inhospitability to class actions, as reflected in the recently enacted Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat. 737 (1995), and by its recently expressed concern about the workload of the federal courts, might not bode well for such a prospect.

In a different vein, Congress might enact compensation-like statutes dealing with particular mass torts.[0] Alternatively, Congress might enact a statute that would deal with choice of law in mass tort cases, and provide that one set of laws would apply

---

[0] For example, Judge Weinstein calls for a broad compensatory legal framework to give mass tort victims a means of recovery independent of tort law.  See Jack B. Weinstein, Individual Justice in Mass Tort Litigation (1995).

to all cases within a class, at least on issues of liability. Such legislation could do more to simplify (and facilitate) mass tort litigation than anything else we can imagine.

Another route would be an amendment to the Federal Rule of Civil Procedure 23. We are aware that the Judicial Conference Advisory Committee on Civil Rules is in fact studying Rule 23, including the matter of settlement classes. One approach the Rules Committee might pursue would be to amend Rule 23 to provide that settlement classes need not meet the requirements of litigation classes. The Rules Committee, of course, should minimize due process concerns, but it might address them via opt-in classes, or by classes with greater opt-out rights, so as to avoid possible due process problems.

The Rules Committee might also consider incorporating, as an element of certification, a test, akin to preliminary injunction analysis, that balances the probable outcome on the merits against the burdens imposed by class certification. This kind of balancing might engender confidence in the integrity of classes thus developed. But this approach has problems too, not only in terms of the potential for satellite litigation, but also in terms of the impact of the threshold decision on the outcome of the case.

Perhaps this case, with its rich matrix of factual and legal issues, will serve as a calipers by which the various proposals before the Rules Committee might be measured. While we hope that these observations are useful, we express doubts that anything less than statutory revisions effecting wholesale

changes in the law of mass torts could justify certification of this humongous class.  In short, we think that what the district court did here might be ordered by a legislature, but should not have been ordered by a court.

The order of the district court certifying the plaintiff class will be vacated and the case remanded to the district court with directions to decertify the class.  The injunction granted by the district court will also be vacated.  The parties will bear their own costs.

**NOS. 94-1925, etc.; <u>GEORGINE, ET AL. V. AMCHEM PRODUCTS, ET AL.</u>**

**HARRY W. WELLFORD**, Circuit Judge, **concurring:**

I fully subscribe to the decision of Judge Becker that the plaintiffs in this case have not met the requirements of Rule 23. I have some reservations, however, about any intimation that Congress might or should enact compensation-like statutes to deal with mass torts or that we approve any suggestion of Judge Weinstein "for a broad compensatory legal framework to give mass tort victims a means of recovery independent of tort law." <u>See</u> n.17. I concur in the observation, however, that Rule 23 might be amended to aid in the process of mass settlement in the class action context.

I am of the view, moreover, that the "futures claims" presented by certain plaintiffs, as described in the court's opinion, do not confer standing to these exposure only plaintiffs. Plaintiffs of this type do not claim presently to suffer from any clinically diagnosable asbestos-related condition; they merely assert that they were exposed to asbestos fibers at some time in the past. In <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555 (1992), we were reminded that federal courts under the Constitution have jurisdiction to consider only real cases and controversies. <u>Id.</u> at 559. At a minimum, standing requires:

> First, the plaintiff must have
> suffered an "injury in fact"--an

invasion of a legally protected
interest which is (a) concrete and
particularized, see *id.*, at 756;
*Warth v. Seldin*, 422 U.S. 490, 508
(1975); *Sierra Club v. Morton*, 405
U.S. 727, 740-741, n.16 (1972); and
(b) "actual or imminent, not
`conjectural' or `hypothetical,'"
*Whitmore*, *supra*, at 155 (quoting
*Los Angeles v. Lyons*, 461 U.S. 95,
102 (1983)).  Second, there must be
a causal connection between the
injury and the conduct complained
of--the injury has to be "fairly .
. . trace[able] to the challenged
action of the defendant, and not .
. . th[e] result [of] the
independent action of some third
party not before the court." *Simon
v. Eastern Ky. Welfare Rights
Organization*, 426 U.S. 26, 41-42
(1976).  Third, it must be
"likely," as opposed to merely
"speculative," that the injury will
be "redressed by a favorable
decision."

Lujan, 504 U.S. at 560-61 (footnote omitted).

Plaintiffs bear the burden of establishing federal

jurisdiction and their standing to proceed.  Lujan, 504 U.S. at

561; FW/PBS, Inc. v. Dallas, 493 U.S. 215, 231 (1990); Warth v.

Seldin, 422 U.S. 490, 518 (1975).  I do not believe exposure only

plaintiffs have demonstrated any "injury in fact" as of the time

of filing.  Furthermore, I would conclude that such plaintiffs

have not presented a "likely" as opposed to a mere "speculative,"

current injury that could be redressed at trial.  The court's

decision in such a case would necessarily be conjectural at best.

Fear and apprehension about a possible future physical or medical

consequence of exposure to asbestos is not enough to establish an

injury in fact.  I do not believe that Duke Power Co. v. Carolina Environmental Study Group, Inc., 438 U.S. 59 (1978), a case involving actual nuclear power emissions, supports the plaintiffs' position.  The case, moreover, did not contain claims for money damages.  Nor does Helling v. McKinney, 509 U.S. 25 (1993), constitute precedent on which these plaintiffs can rely to support standing.  Helling involved a plaintiff who was continuously exposed to tobacco smoke in limited quarters and claimed that he had certain health problems caused by exposure to cigarette smoke and that he feared further injury if he continued to be exposed involuntarily to this hazard.  Id. at 2478. Standing was not discussed by the Supreme Court, nor by the court of appeals (see Helling, 924 F.2d 1500 (9th Cir. 1991)), presumably because the plaintiff claimed present injury.

In re "Agent Orange" Products Liability Litigation (Ivy v. Diamond Shamrock Chemicals Co.), 996 F.2d 1425, 1434 (2d Cir. 1993), cert. denied, 114 S. Ct. 1125 (1994), may suggest to the contrary, but I would adopt here a prudential limitation on standing, under these particular circumstances, as to exposure only plaintiffs who have not yet manifested a distinct and palpable injury-in-fact.  See John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 Col. Law Rev. 1343, 1422-1433 (1995).  I do not intimate that prudence would always preclude any and all suits by "future claimants" who have been exposed to some calamitous occurrence or substance.  This view in this case is supported by the testimony of the plaintiffs themselves.  The exposure only class representatives admitted

under oath that they would not have continued with the litigation in the absence of a settlement.  Robert Georgine responded to questioning:

> Q.Have you ever gone to a lawyer for your own personal reasons to file a claim for yourself?
>
> A.No.
>
> Q.--for asbestos related injury?
>
> A.No.
>
> Q.And why is that?
>
> A.<u>I haven't had a problem</u>.
>
> Q.Is that still true today? That you haven't had a problem?
>
> A.Well, I don't--I breathe normal--<u>I don't have any</u> <u>problems that I'm aware of</u>. That's not to say that one can't develop.
>
> Q.Oh, I understand that.
>
> A.Okay.

Q. And God forbid, I hope nothing ever does develop, but until you develop an asbestos-related problem, you have no intention of filing a lawsuit for damages, do you?

A. Other than the present-- present case?

Q. Well, in the present case, do you believe that the asbestos companies owe you money? M-O-N-E-Y.

A. Owe me personally?

Q. Yes.

A. I believe that if there was anything that happened to my lungs that was asbestos-related, that they would owe me money, yes.

Q. But as of today, nothing has happened to your lungs that's asbestos-

                     related that
                     you know of?

                     . . . .

                     A. For myself,
                     that's right.

                     . . . .

                     Q. As you sit
                     here today, you
                     are not
                     suffering any
                     emotional
                     distress
                     because you
                     might come down
                     with an
                     asbestos--

                     A. No, I am not.
                     I am not.

J/A 1204-06 (emphasis added).  At the fairness hearing, Ambrose
Vogt testified similarly:

                     Q. Now, prior to
                     your
                     participation
                     in this class
                     action, you had
                     never consulted
                     with a lawyer
                     for the purpose
                     of filing a
                     claim as a
                     result of your
                     asbestos
                     exposure, isn't
                     that right?

                     A. Yes.

Q.You testified under oath on January 12th, 1994, that you were not seeking money damages at the time that you agreed to be a class representative in this case, and at the time that the lawsuit was filed?  You testified that way under oath then, isn't that correct?

A.Yes.

Q.And that was true then, is that right?

A.Yes.

Q.And it is true today, it is not, you are not seeking money damages today?

A.Not today, no.

Id. at 1280-81.  At his deposition, class representative Ty Annas also made clear that he would not have brought suit had it not been for the settlement.  Id. at 1179.  On cross-examination, Annas stated:

Q.As of today, can you think of any out-of-pocket loss

> that you've had
> as a result of
> your exposure
> to asbestos?
>
> A.Not from
> mine.
>
> Q.So, Mr.
> Annas, would it
> be fair to say
> that you don't
> believe you've
> lost any money
> at all as a
> result of your
> exposure to
> asbestos?
>
> A.No, sir.
>
> . . . .
>
> Q.So you, on
> January 15,
> 1993, had no
> interest in
> recovering
> money for
> yourself from
> the asbestos
> companies; is
> that right?
>
> A.Yes.

Id. at 1178–79.  At the fairness hearing, Mr. Annas reiterated

even more clearly that he did not seek damages of any kind from

the CCR defendants:

> Q.At deposition
> you testified
> that as of
> January 15th,
> 1993 that you
> hadn't
> authorized
> anybody to sue
> for money for

yourself because of your asbestos exposure, is that right?

A. That's right.

Q. And that is correct today?

A. Yes, sir.

Q. And when you appeared at deposition, you testified I believe that you got involved in this case in order to help to get the case resolved and to help people before the money runs out, is that correct?

A. That's my statement.

. . . .

Q. If they're [people exposed to asbestos] not impaired they should receive no compensation whatsoever?

A. That's my feelings.

Id. at 1269-72. Representative plaintiffs Timothy Murphy and

Carlos Raver also stated emphatically that they were not seeking

damages of any kind at the time the complaint was filed.  At his

deposition, Murphy testified as follows:

> Q.Let's go back, let's say, a month in time, prior to the communication that you had with Mr. Weingarten [counsel for Greitzer & Locks] three or four weeks ago. Before that communication, did you know what it was that you were claiming in this lawsuit?
>
> A.I know what I--that I claimed that I was occupationally exposed to asbestos over a long period of time.
>
> Q.Did you know that you were claiming money damages?
>
> A.No.
>
> Q.To this day, do you believe you are claiming money damages in this case?
>
> A.No.

> Q. So you are not seeking any recovery in terms of money damages in this case; is that right?
>
> A. No. Not at this time.

Id. at 1124 (emphasis added). Raver testified to the same effect:

> Q. Did you conclude in 1991, sir, that based on your physical condition at that time that you, in your words, didn't deserve any money and didn't need any money? Was that a decision that you made?
>
> A. Yes, sir.
>
> Q. When you filed this lawsuit, the one that was filed in January of 1993, at the time that you filed the lawsuit, had you decided that based on your condition at that time that you didn't deserve any money and didn't want any

                    money at that
                    time?

                    A. That's true,
                    sir.  I didn't
                    want any money
                    at that time.
                    Still don't
                    want any money.

Id. at 1147-49.  These representative plaintiffs clearly conceded

at the fairness hearing that, absent the settlement, they did not

intend to pursue the claims in the class complaint.  They claimed

no damages and no present injury.  I would hold, accordingly,

that the exposure only plaintiffs had no standing to pursue this

class action suit.

        I concur in the court's decision to reverse the

district court, vacate the order certifying the plaintiff class,

and remand with instructions to vacate the injunction.  I would

also hold further that exposure only plaintiffs have no standing

to pursue their claims.